Good morning. May it please the court, my name is Melinda Cantrell. I'm arguing on behalf of the defendant and appellants in this case. Defendants respectfully submit they are entitled to summary judgment and request that this court reverse the trial court's order denying summary judgment in their favor. I would first like to concentrate on plaintiff's claims against the supervisor defendants in this case. That's Captain Clark, Lieutenant Gonzalez, and Sergeant Inge. In his brief, plaintiff argues that he raised a triable issue of fact as to liability against these supervisor defendants based upon nine prior unrelated incidents that happened at the men's sexual jail between 2002 and 2005. Basically, plaintiff claims that since these bad incidents happened in the past, these supervisors are automatically liable. There are three main problems with plaintiff's attempts to rely upon these prior incidents to raise a triable issue of fact against these supervisors. The first is the prior incidents are too broad. There is no connection between the prior incidents and the plaintiff's incident in this case. The plaintiff was not involved or injured in the prior incidents. The same inmates were not involved in the prior incidents as in this incident. Well, why does that even matter? I mean, the men's central jail had repeated problems with inmate on inmate violence for years. How is it possible that Deputy Garibay, who was assigned to one of the most dangerous areas in the jail, had no knowledge that letting inmates access the cells without monitoring could result in violence? How could he become the deputy in charge of that very dangerous part of the jail without being aware of the possibility of danger? Well, Deputy Garibay ---- Now, you were speaking earlier, as I understand it, to the supervisor. That's correct. That is Clark, Gonzales and Ng. That is correct. And it's a very relevant ---- Are you speaking only with respect to Ng and Gonzales and Clark? Right now I'm addressing the claims against the supervisor defendants, and it's highly relevant ---- Those three. Those three. It's highly relevant because general allegations of lax supervision within the jail or failure to supervise are insufficient to show that these deputies failed to take action. As you indicated, there's 5,000 inmates in the men's central jail. Without a connection tying these incidents together, there is no specific risk with which these supervisory defendants could seek to prevent. They can't be deliberately indifferent when there's no specific problem that they can address. These prior incidents involved classification issues within the jail, a mental ---- an inmate with mental issues being sent to the general population, housing ---- cellmates housed together, attacking each other, using alcohol, homemade alcohol. The inmates brewed some ---- it's called pruno, and the attacks resulted from that. Allegations that attacks happened in the day room and in the housing room because there's too many inmates. An incident where an inmate was found hanging in a cell. And, in fact, one of these prior incidents, Alvarado, didn't even take place in the men's central jail. Counsel, maybe you want to switch now to the Garibay issue and answer Judge Nelson's question with respect to Garibay. I'm sorry that I started with Garibay, but I do have a question about Clark. Since you were talking about Ng, Gonzalez, and Clark, I have no question about Ng and Gonzalez, but about Clark. He was responsible for training and monitoring, and he admitted that he knew violence was a systemic problem on the 2000 floor. He didn't do anything to stop it. Isn't this the kind of knowing acquiescence to unconstitutional conduct that we held to be actionable in Star 1? No, I would respectfully disagree, Your Honor, because Star 1, first of all, was Pleading's case, and that addressed Sheriff Baca. Now, Captain Clark indicated he had some knowledge of these specific incidents, but he didn't even become captain of the men's central jail until August of 2004, after some of these prior incidents had occurred. But the main problem is just saying inmates on inmate attacks happened is too broad. There's no specific harm that you could say Captain Clark had a culpable conscious refusal to address and that he could have prevented. I mean, you have all these different types of inmate attacks in this large jail with so many inmates. Unfortunately, inmate and inmate attacks, you know, occur in a jail setting. But unless you have the same tie running through, there's no specific harm that Captain Clark could say, okay, I see that, you know, there's this ongoing problem. Every time this A happens, B results. He's responsible for training. He admitted he didn't change the training. He knew there was a lot of violence, but he did nothing. The training program didn't change at all. Your Honor, I would respectfully disagree with that characterization of the record. One problem we have here is the district court did not make findings as to the liability, tribal issues of fact, to show liability against these supervisor defendants. And I think that if a review of the evidence is undertaken with regard to the prior incidents, after each incident action was taken and recommendations for change were recommended. But, again, there's nothing that you can say against and a very important issue is causation. There's nothing that you can say that Captain Clark did that led to the plaintiff's injury. Causation, you have to have either Captain Clark participated in the event, directed the subordinates to take the action, set in place a series of motions so that the constitutional act occur, or that he knew that this action was going to take place and failed to prevent it before the injury occurred. Knowledge and acquiescence of an injury that is about to occur, that he could have actually done something using this hodgepodge of knowledge. Well, I understand your answer. And I think, as Judge O'Scannon suggests, maybe you ought to move on to Deputy Garibay and Deputy Bugarin. Okay. I will move on to them, and then maybe I can come back, because there's a few other points I'd like to make to the supervisor defendants. Deputy Garibay, basically the allegations against him are that he shouldn't have allowed these trustees into the role where the plaintiff was housed. And the plaintiff attempts to, based on plaintiff's facts, they try to raise an issue that this specific trustee should not have been allowed to be a trustee. But there's no evidence or facts showing that Deputy Garibay would have had any reason to know that. And the plaintiff further, basically the plaintiff says he was stabbed by an inmate, Bellows, and Bellows was a trustee. That's in the record ER 700, 644, and 345. The plaintiff also claims that Deputy Garibay should not have opened the row and should not have, or should have visually watched, stared at the trustees the entire time they're in the row. I would like to say that based on Ford v. Ramirez, the alleged failure to follow these prison officials, if anything, arises to negligence and not to the high standard of deliberate indifference. There's nothing in the record to show a deliberate, culpable conduct by Deputy Garibay in relation to this case. No actual evidence submitted or no actual, based on the plaintiff's facts. Importantly, Deputy Garibay would be entitled to qualified immunity. The case law has not fleshed out at what point trustees are allowed to enter a restricted area, changes from a risk of some harm to a substantial risk of harm. So as in Ford v. Ramirez, the law has not clearly established that the facts, plaintiff claims that he did would have violated a plaintiff's 14th Amendment rights. And as to Deputy Bugarin, we're only appealing the failure to timely provide medical care, and that is one instance where the court said there's not a written order about tribal issue of facts, but he did say that there was a tribal issue of fact as to whether she refused to take plaintiff for treatment between January 27th and February 5th. He had already been seen, and we would submit that his complaints of nose pain and a five-day delay doesn't arise to the level of deliberate indifference to his medical care. Counsel, let me just say what bothered me about that, is that she said, well, I didn't really think he needed to look at it. It was red, and I thought he may have had a cold. Well, she was the one who kicked him in the head with his steel boot, pointed boot. Well, he was taken for medical care directly after the incident and released. So I think that, given that, that he had already been seen and treated for medical treatment, a reasonable officer went, could have believed their conduct of a delay of five days for complaints of nose pain was reasonable and didn't arise to the level of deliberate indifference to a substantial medical need. And if I may now circle back to the supervisor defendants, as we were discussing, the three main problems I have with the prior incidents are that they're too broad, and then number two, they didn't, the plaintiff has not shown knowledge of these prior incidents by each of these defendants. They claim LSD knew this, LSD knew that. Well, knowledge of a public entity is not imputed to the public employees. In fact, Sergeant Inge did not start working until November of 2005 after all of these prior incidents occurred. And that's found in the record at ER 2070. And as I indicated, Captain Clark didn't start until August 2004. I think it's very unfair to say, well, these various inmate-on-inmate harms in different manners with different inmates happened in the past. Oh, this inmate-on-inmate attack occurred. You're automatically liable for that in your individual capacity. It's highly, highly unfair to allow a plaintiff to maintain liability in this favor. In fact, the district court, as to these supervisor defendants, said that he didn't understand what the plaintiff's claims were against these supervisor defendants, that the claims remain unclear. In that regard, summary judgment should have been granted in their favor. We are at the summary judgment stage. We are past the pleadings. If the judge can't even make out a viable issue, then the claims should have been dismissed. Qualified immunity is, of course, a very important defense, and it's an immunity to stand trial. And these three supervisor defendants should not have to stand trial based on the allegations made by the plaintiff in this case. In Lear? We have a decision of this Court involving this plaintiff, that jail, and circumstances surrounding the same incidents, and that's Starr v. Baca. In that case, Judge Fletcher, over dissent, wrote a detailed summary of incidents that, in the view of the majority, provided the notice to the sheriff, at least, that could permit a jury to infer recklessness to the point of conscious indifference. Now, my assuming that's true, and assuming the same incidents are being relied upon in this case to show an environment or a set of circumstances that would lead a reasonably prudent person to infer danger and the requirement of more supervision, why can't we say that's enough to get across the summary judgment barrier? Two reasons, Your Honor. As you indicated, the first case involved Sheriff Baca. In Lear v. Murphy, the Ninth Circuit stressed that a very individualized approach must be taken when a prison inmate seeks to hold a prison official liable in a Section 1983 action for a failure to prevent an inmate-on-inmate attack. These individual defendants are not the sheriff of the jail, and they must be analyzed with regard to their specific positions. And, as I mentioned, Sergeant Inch didn't even start working at the facility until after these prior incidents occurred. How could you argue, you didn't even work here, and now that you do and something happens, you're liable? That's completely unfair. And second, very importantly, this is the summary judgment stage. Now, in Starr v. Baca, they allowed the claims to proceed to saying that they had raised a triable, I mean, to proceed against the claims, the pleading stage, but as Judge Trotted noted on his dissent, I think his last sentence was on the summary judgment, and here is summary judgment. So this is not a pleading stage. The evidence that has submitted can no way show liability by these specific defendants. And there's another important point I want to say as well is post-incident conduct, that's the other facet they allege, cannot establish causation. Under Ashcroft, you have to be the causal reason of a plaintiff's deprivation of constitutional rights. So the allegations of the failure to investigate this incident in post-incident conduct cannot establish causation. These individuals are being sued in their individual capacity, and the lawsuit can't be based on ratification, as with the Bonnell claim, or after the fact conduct. So I just want to stress those points as well. And I will, if I have any time, I see I have just barely a few seconds. I'll get in. I'm afraid you have already exceeded your time. Thank you, counsel. Your time has expired. We'll hear now from Mr. Paz. Yes, Your Honor. I'd like to first apologize. My grandson blessed me with a wonderful cold. And so if my voice doesn't make it, I'll just want to let you know. I'll do my best. I'd like to address a couple of points to start with. First, at the onset, I think it's important, and maybe I think the counsel's repeated references to Lee versus Lear versus Murphy and the line of cases, both the opening brief at pages 35 through 44 and the reply brief pages 10 through 11 basically argue that we are suing the supervisors under a theory of failure to protect. That's absolutely incorrect. If you look at the motion for summary judgment and also the Third Amendment complaint. But it's still an Eighth Amendment challenge. Fourteenth Amendment. He was pretrial, Your Honor. But, yes. Okay. But Fourteenth Amendment through the Eighth Amendment, right? Right. Okay. But the state that would do it. With cruel and unusual punishment. And this would be a derivative of that. No. The theory against the supervisors as it was against Baca. The fact they're named in the same cause as Baca is a failure to supervise, a failure to train, and a failure to discipline. And a failure to investigate. But to what extent does that tie into a constitutional basis? The constitutional violation is pretty well laid out. There's a recent case, I think, that helps the Court delineate the distinction. I'm sorry. Hunter v. Sacramento at 652 Fed 3rd, 1225. Is that in the brief? No. This is new, Your Honor. All right. If it's new, be sure and give that citation to the deputy clerk and make and she'll give you some copies to see if it's new. And this is the case that the court recommended to serve on your opponent and one copy each for the judges. Very well, Your Honor. In that case, there was an issue of how do we prove custom and practice when there's a supervisor involved and whether or not you can look at the situations. And there they say, we've long recognized that a custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded. Lists a whole bunch of sites that I'm sure the Court is familiar with. Footnote 8 and footnote 9 specifically recognize that the evidence of inaction, specifically failure to investigate and discipline employees in the face of widespread constitutional violations, can support an inference of unconstitutional custom or practice that has been unofficially adopted by a municipality. Again, citing the case. Now, that's a Monell claim, though. Well, it's also in the line of personal liability. Okay. We're on qualified immunity here. Yes.  And qualified immunity. And that's specifically the same line of cases and reasoning. All of the cases in Star 1 were cited for personal liability cases. So there's a series of cases, all of which address that issue, whether or not an officer, a supervisor on the scene who knows about a particular custom or practice and does nothing about it even after the fact. But aren't you alleging personal responsibility against these prison wardens or at least these prison officers? Yes, Your Honor. And the reason is, is that each one was on duty that day. Each one received the initial complaint. Each one received the medical evidence. Each one had the statements of what occurred in the cell. The fact that Mr. Star complained that I'm in my cell, all of a sudden these guys opened the gate, they come in and attack me. So your concern and the predicate for your cause of action is not on events that led to the assault on Star, but rather what happened afterwards? They are, Your Honor. It's really in the context of what the Court said in Farmer v. Brennan. The Court said plaintiffs presenting evidence showing a substantial risk of inmate attacks was a, quote, longstanding, pervasive and well documented or expressly noted by prison officials in the past and the circumstances suggesting that a defendant official being sued had been exposed to that information concerning the risk and thus, quote, must have known it, known about it that such evidence would be sufficient to remit a prior fact to find that the defendant official had actual knowledge of the risk. So it's really a symbiotic relationship. If you work in a place and there's repeated acts of the same nature, and I know defense counsel has argued that the unrelated, they are related, none of those acts happen when there's not a violation. The guards allowed access to one inmate to another, allowed them to have, to use violence. But how does this establish deliberate indifference? You know, you still have that Eighth Amendment hurdle to get over. That's correct. If they, and again, the passage I just quoted is at Farmer v. Brennan at page 842-843. The Court specifically went to lengths to talk about the fact that to show liability, you don't have to know the specific person who's going to attack the defendant, nor does the victim have to tell the guards, here, I'm under this risk. It's enough if they know of the nature of the condition. The nature of the condition in this case is specifically that they knew at that time that African-American inmates were being attacked by Hispanic gangs. And in our motion for summary, in our opposition to the motion for summary judgment, we showed that those attacks, not necessarily just limited to African-Americans, but that the racial attacks by Hispanic gang members in the L.A. County jail were at an alarming rate and continued even worse after this incident because there was no supervision. Were the assailants in this case gang members? Yes. Yes, Hispanic gang members, known Hispanic gang members. One was in for murder, one was in for espousal abuse, both of which should have never allowed them in that role at all. They were disqualified to be innate workers by the nature of their crimes. The case I want to share with the Court is also one which is not cited. It's really on point, much more on point than the case that's been argued by counsel, this Jeffers case. Counsel, did you file a 28-J letter with respect to this case? I did not, Your Honor. Well, then, same routine. Be sure and get copies of the gum sheet. Right. There, the same issue was qualified immunity. The circuit, the Ninth Circuit held that where an African-American was attacked by Hispanic member gang members who were known to be in opposition to African-Americans, and the staff knew this because of, as in this case, prior attacks against African-Americans and a series of riots, which are also in the MSJ, with African-Americans attacking African, I'm sorry, with Hispanic gang members attacking African-Americans, that then the circuit found that they, that the constitutional violation was fatal to protect, that it was clearly established in Farmers v. Brennan, and no reasonable official could believe that allowing, in this case, opening the gates to three unauthorized persons in a place where each person has, wearing a wristband, where they're supposed to be checked at the entry to the gate with electronic scanning devices to see if they even belong there, Mr. Garibay simply fell asleep at the wheel or was complicit in some way in allowing them into the row, and then after allowing them into the row, then allowing him into, in opening two cells, not only Mr. Starr's cells, but two cells on each side of him where other Hispanic gang members came in and attacked him. So this is something that has, the pattern and the practice and this custom of jail violence has been at the center of the public attention in this county. And there has been a form, a county has formed a commission. They've given the report just September 28th of this year. They issued a report basically saying exactly what our complaint states, that there's a custom and a practice and a failure to supervise policy that allowed, for years, allowed this pattern of inmate attacks to prevail. So it's not like, I mean, we just happened to bring the case out of a 2006 incident, and this has continued since then, and it didn't stop until August of 2011 when this commission and the FBI started to investigate the jail. So it's not things that we, we're creating, all of the evidence we've presented about the continuous lack of supervision, the continuing allowing inmates access, the continuous abandoning of their positions in the jail led to this again and again and again. That was the risk that the officers knew. And the argument, well, gee. So what specifically would you have had these supervisors individually do that would have prevented this assault? They couldn't have prevented this assault. However, supervisors should have immediately investigated the basic policies. So you are concerned about events that occurred after the assault rather than before. That's correct, Your Honor, because it is part of the custom and practice. And post-incident events can prove the custom and practice in the unconstitutional conduct. The post-incident action should have been immediate investigation. Who opened the gates and why? Why were these people even in the row in the housing area when they didn't belong there, who didn't check their wristbands? Each one of these things should have been done immediately. None of them were done. But, counsel, I don't know why you're confining your argument to post-incidents, because as I read the record, nearly a quarter of the violence in Men's Central occurred on the 2,000th floor where Starr was housed. That's correct, Your Honor. So that doesn't that mean that the supervisor, specifically Mr. Clark, who even testified that half of the inmate murders in, quote, recent years had occurred on the 2,000th floor site. That's correct. And in answering the question from Judge Singleton, the answer is, yes, what these particular officers did was post-incident. However, the context in which this case is brought is in the context of all of the incidents that took place and what these officers should have known and probably and certainly didn't know. The argument that Sergeant Ng just started to sort of work, it sort of is, it's hard to imagine that if somebody walks into a place where you have this history of violence and it's their job to provide security, that somebody's not going to say, the lieutenant is not going to say, oh, by the way, Sergeant, welcome to the job. We have a real serious problem here with violence. And this is what's happened in the past. Counsel, excuse me. I hate to interrupt again, but your time is running out. I wanted to see if you had an answer to opposing counsel. With respect to Deputy Bugaran, after the attack, Starr received medical care and was discharged. Later, a doctor found that his nose wasn't broken. Was his nose pain really this sort of serious injury that amounts to a constitutional violation? Yes, Your Honor. And I would just simply – I know that the brief, the opposing party's brief admits that he was denied medical care for five days. I would point the Court to Owens v. City of Cincinnati at 414 Fed 3rd, 596, 6th Circuit, 2005. There, the Court rejected qualified immunity because the deputies failed to provide medical care for six minutes once they knew of the serious medical condition. There is no doubt that if from the description provided to the Court in the medical records that Mr. Starr's condition was substantial and serious. He was bleeding from the mouth and nose for all of the five days, and that's why he continued, went to court on the fifth day and got a court order to – for medical care. And even after that, he was delayed one more day by Deputy Bugaran. Is my time up, Your Honor? No. You still have a minute. I want to thank you. Is there any questions? No questions. Thank you, Counsel. The case just argued will be submitted for decision.
judges: Singleton, Nelson, O'Scannlain